RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0327P (6th Cir.)
File Name:  03a0327p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 01-2569

WARD WESLEY WRIGHT,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80876—Patrick J. Duggan, District Judge.

Argued:  August 5, 2003

Decided and Filed:  September 12, 2003

Before:  KEITH, COLE, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Richard J. Amberg, Jr., Waterford, Michigan, for Appellant. Joseph J. Allen, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Richard J. Amberg, Jr., Waterford, Michigan, for Appellant. Joseph J. Allen, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge.  Defendant-Appellant Ward Wesley Wright appeals his jury conviction and sentence for the use of interstate commerce facilities in the commission of murder for hire, interstate travel in aid of a crime of violence, and conspiracy to possess with intent to distribute and to distribute cocaine.  Wright raises four arguments on appeal: (1) the district court erred in denying his motion to dismiss his indictment based on violations of the statute of limitations and the Due Process Clause of the Fifth Amendment; (2) the Government is guilty of prosecutorial misconduct; (3) the district court erred in denying his motion to suppress evidence obtained pursuant to a search warrant; and (4) the district court erred in admitting hearsay evidence.

For reasons stated below, we **AFFIRM** the jury conviction and sentence entered by the district court.

### I.  BACKGROUND

#### A.  Factual Background

Brian Chase, Raymond Kelsey, and William Arbelaez met while serving time in a Minnesota prison.  After all three had been released in 1992, Chase met Wright while they were both bouncers at a bar in Michigan.  Wright was a member of the Avengers Motorcycle Club (the "Avengers") and was involved with cocaine distribution through the club.  Arbelaez, a Colombian national who trafficked cocaine, began supplying cocaine to Chase from Colombia, and Chase in turn began selling cocaine to Wright.

In 1992, Arbelaez was arrested on drug charges in New Mexico.  He escaped from prison and sought to flee to Colombia.  Chase contacted Kelsey, a licensed pilot, and he

agreed to fly Arbelaez out of the United States. Kelsey flew Arbelaez to the United States-Mexico border, and Arbelaez fled to Colombia from there.

In 1993, Arbelaez began supplying cocaine to Chase from Colombia and Kelsey became the pilot of the operation. In February, Kelsey flew to Los Angeles to retrieve a fifty-kilogram shipment of cocaine and then flew to Detroit to deliver it to Chase. Chase sold part of the shipment to David "Slap" Moore, a member of the Avengers, who would eventually become Chase's primary distributor. Chase sold the other part of his shipment to Wright, who delivered part of his allotment to Chase's customers and sold part of his allotment to his own customers.

Shortly afterward, Kelsey flew twenty-five kilograms of another shipment to Chase for distribution. Chase and Kelsey decided not to pay Arbelaez for the cocaine and told him that it had been seized by Canadian authorities. In the spring of 1993, Kelsey made another trip to Los Angeles and picked up what was supposed to be seventy-five kilograms of cocaine. However, Chase and Kelsey learned that the shipment contained only sixty-six kilograms. Chase distributed the drugs without notifying Arbelaez of the deficiency and Wright received some of the shipment.

At this point, Moore was no longer distributing cocaine for Chase. Instead, Moore introduced Chase to his main customer in Detroit, and Chase supplied cocaine directly to that customer. Moore wanted a commission from Chase for the sales to his customer, but Chase refused. Moore told Chase that he "knew how to take care of business," and Chase believed that this was a threat and that Moore intended to kill him. Chase then discussed the "Moore problem" with Wright and told Wright that he was willing to give Moore $40,000 to end the dispute. Chase offered Wright $10,000 to broker the deal with Moore, but Wright was unable to arrange a deal. Wright then suggested, "Why don't you just give me the money and I'll kill Mr. Moore." A few days later, Wright

told Chase that Moore had given another Avenger a gun and $10,000 for a contract murder and that Chase was the target. Chase and Kelsey then decided to kill Moore to end the dispute and the perceived threat.

In July 1993, William Anderson Burke, a past national president of the Avengers, was involved in a motorcycle accident in Columbus, Ohio. Moore, as an officer in the Avengers, traveled to Columbus to await Burke's release from the hospital. Chase and Wright decided that Wright could kill Moore while he was in Columbus, and Wright agreed to accept $50,000 to commit the murder. Wright's girlfriend, and later wife, Brenda Schneider, called Moore's wife to determine what hotel Moore was staying at in Columbus.

On July 29, 1993, Wright obtained a .22-caliber pistol and a car that had been purchased by Chase and Kelsey, and drove to Columbus. Wright found Moore's hotel room in the early hours of July 30, and asked Moore if he could stay the night. After Moore let him in and went back to sleep, Wright shot Moore in the head twice. Before leaving, Wright "wiped down" everything and took Moore's wallet and pager. He called Chase, told him everything was okay, and returned to Chase's house in Michigan.

Kelsey, who was at the house when Wright returned, used a welding torch in Chase's garage to melt the pager, the wallet, and the gun. Kelsey then piloted a plane, with Chase and Wright as passengers, and the three men dumped the melted objects and Wright's clothes over Lake Huron. Chase paid Wright $50,000 for the murder on the evening of July 30.

On August 10, 1993, Wright married his girlfriend, Brenda Schneider, in Las Vegas using the alias Arthur Anderson. Wright and his new wife stayed in Las Vegas gambling and Larry Joe Powell, another Avenger, good friend of Wright, and FBI informant, wired them money.

After the murder, Arbelaez, who was still living in Colombia, wanted Chase and Kelsey to pay him for the twenty-five kilograms of cocaine "lost" to the Canadian authorities and the nine kilograms of cocaine missing from the seventy-five-kilogram shipment. Arbelaez devised a plan for Chase and Kelsey to repay him for the missing cocaine. He decided that they could steal airplanes and give them to Arbelaez's cocaine supplier, the Medellin Cartel in Colombia (the "Cartel").

In January 1994, Kelsey flew Chase and Wright, traveling under the alias of Arthur Anderson, to the island of St. Martin to meet with Arbelaez to discuss the plane-stealing scheme. When Arbelaez failed to show, the three flew back to the United States. Chase and Kelsey then traveled to Venezuela and Colombia to meet with the Cartel regarding the types of airplanes that they wanted stolen. In the spring of 1994, Chase spoke with Kelsey, Wright and Burke and they decided to steal planes together. Arbelaez also had his relative, Efrain Ruiz, join the scheme. Kelsey scouted planes, and Wright and Burke secured aviation fuel in a hangar for refueling the plane on the way to Colombia. On May 7, 1994, the five of them successfully stole a United States Forest Service plane in Atlanta. They flew the plane to Florida where Chase, Wright and Burke refueled the plane, which Kelsey then flew to the Cartel in Colombia.

On October 6, 1994, Kelsey stole another plane in Arkansas, refueled it in Florida, and flew it to Colombia. Wright did not participate in this theft. In November 1994, Kelsey picked up cocaine from Arbelaez, and flew it to Chase and Burke in Michigan. However, Chase and Kelsey did not pay Arbelaez the entire shipment, and were worried that Arbelaez would retaliate. They decided to steal another plane to make up for the missing payment. On February 18, 1996, Kelsey stole a plane in Florida, and Wright and Burke set up a refueling site. Kelsey and Chase then flew the plane to Colombia for delivery to the Cartel.

In April 1996, while attempting to return from Colombia, Kelsey was arrested in St. Martin and he agreed to cooperate with authorities. He then recorded several conversations with Chase and Burke regarding drug shipments and Wright's involvement in the drug deals. In October 1996, Chase and Burke went to Detroit, believing that they were to meet Kelsey for a drug delivery. Instead they were arrested. Kelsey pleaded guilty to several charges across several states, including drug trafficking, stealing planes, and aiding and abetting a murder for hire. He was sentenced to mulitple terms of imprisonment. In April 1997, government agents obtained a warrant to search Wright's Las Vegas apartment where they recovered evidence linking Wright to the Moore murder.

### B. Procedural Background

Wright was originally charged in an indictment with: (1) the use of interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958; (2) conspiracy in the use of interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958; (3) interstate travel in aid of a crime of violence, in violation of § 1952(a)(2); and (4) conspiracy to possess with intent to distribute and to distribute cocaine, in violation of 18 U.S.C. §§ 846, 841(a)(1). However, the Grand Jury returned a First Superseding Indictment on April 22, 1997, only charging Wright, Chase and Burke with Count Four, participation in the cocaine conspiracy.

On September 9, 1997, the Government moved to dismiss the indictment without prejudice as to Wright, arguing that the prosecution of Wright would jeopardize an ongoing investigation of the Avengers. The motion was granted. On July 23, 1998, the Government obtained a Third Superseding Indictment against Wright, charging Wright with all four counts of the original criminal complaint. The Government obtained an order sealing the indictment on the grounds that the ongoing investigation of the Avengers and the protection

of potential government witnesses and undercover agents required that the indictment be sealed.

Chase pleaded guilty to conspiracy to possess with intent to distribute cocaine and the use of interstate commerce facilities in the commission of murder for hire. Judgment was entered against him on October 7, 1998.

In December 1998, Burke stood trial on the single count in the First Superseding Indictment, participation in the cocaine conspiracy. He was convicted by a jury and his conviction was affirmed on appeal to this Court. *United States v. Burke*, No. 98-1800, 2001 WL 392039 (6th Cir. Apr. 9, 2001) (unpublished). In January 2000, the Government revealed the identity of the informant being used in the investigation of the Avengers, Powell, and on January 25, 2000, the Government obtained an order unsealing the Third Superseding Indictment. On April 3, 2001, the district court held a hearing on Wright's motion to suppress evidence, and that motion was denied on April 4. On May 8, 2001, the district court held a hearing on Wright's motion to dismiss the indictment based on violations of the statute of limitations, the Due Process Clause, and his right to a speedy trial. On May 9, 2001, the district court denied that motion.

On June 11, 2001, following eight days of testimony, the jury found Wright guilty of all three remaining counts of the Third Superseding Indictment.[1] Both Chase and Kelsey testified against him. Wright was sentenced to two terms of life imprisonment and one term of sixty months of imprisonment.

---

[1] By stipulation of the parties, Count Two, conspiracy to use interstate commerce facilities in the commission of murder for hire, was dismissed prior to the conclusion of Wright's trial.

## II. ANALYSIS

### A. Motion to Dismiss

Wright argues that the district court erred in denying his motion to dismiss the murder charges in the Third Superseding Indictment. He argues that this indictment was improperly sealed and challenges the denial of the motion to dismiss based on the expiration of the statute of limitations and violation of the Due Process Clause.

Wright was indicted pursuant to the First Superseding Indictment on April 22, 1997. This indictment charged Wright only with involvement in the cocaine conspiracy. Upon motion by the Government and after a hearing, the indictment was dismissed without prejudice on September 8, 1997. In support of its motion to dismiss, the Government submitted affidavits from two FBI agents explaining that they were conducting an ongoing investigation of the Avengers and that their primary informant was Powell. The Government argued that proceeding against Wright at that time would require Powell to testify and thus jeopardize the safety of Powell and the investigation of the Avengers. Wright did not object to the Government's request, but asked for the dismissal to be with prejudice.

On July 23, 1998, just prior to the running of the five-year statute of limitations on the murder for hire charges, *see* 18 U.S.C. § 3282,[2] the Government obtained a Third Superseding Indictment against Wright and moved to seal the indictment under Federal Rule of Criminal Procedure

---

[2] Section 3282 reads in relevant part: "(a) In general.--Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."

6(e)(4).[3] In its motion to seal the indictment, the Government stated that the indictment should be sealed because "there is danger of harm to potential government witnesses, and undercover agents, if the indictment is disclosed prior to the completion of a related criminal investigation."

The indictments from the Lorain County, Ohio investigations of criminal activities among the Avengers were unsealed in September 1999, and in January 2000, Powell's identity as an informant was revealed. Wright's indictment was unsealed immediately and he was notified of the charges against him. The Government states that the delay between the unsealing of the indictments in the Ohio cases and the unsealing of Wright's indictment resulted from the completion of the arrests of several members of the Avengers in Ohio and Michigan, and the time it took to place Powell in the Witness Protection Program and to secure the safety of Powell's family.

The decision of a magistrate judge to seal an indictment is accorded "great deference." *United States v. Burnett*, No. 91-1693, 1992 WL 92669 (6th Cir. Apr. 24, 1992) (per curiam) (unpublished) (citing *United States v. Ramey*, 791 F.2d 317, 321 (4th Cir. 1987)). We review a district court's refusal to dismiss an indictment for an abuse of discretion. *United States v. Middleton*, 246 F.3d 825, 841 (6th Cir. 2001); *see United States v. Bracy*, 67 F.3d 1421, 1425 (9th Cir. 1995) (holding that a district court's decision to dismiss an indictment based on a claim of improper sealing is reviewed for abuse of discretion). The factual findings of the district court are reviewed for clear error. *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999).

---

[3] Federal Rule of Criminal Procedure 6(e)(4) reads in relevant part: "A magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial."

### 1. Statute of limitations

The Third Superseding Indictment was unsealed and reopened on January 25, 2000, eighteen months after the statute of limitations on Count One, the use of interstate commerce facilities in the commission of murder for hire, and Count Three, interstate travel in aid of a crime of violence, expired. This Court has addressed the legality of sealing indictments only in a brief, unpublished opinion. *Burnett*, 1992 WL 92669, at *3 ("A sealed indictment that is not opened until after the expiration of the statute of limitations will not bar prosecution unless the defendant can show actual prejudice.") (citing *United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir.), *cert. denied*, 484 U.S. 853 (1987)). Our opinion in *Burnett* is consistent with other circuit courts that have considered the issue of sealing indictments in more detailed, published opinions. Several courts have held that when a sealed indictment is not opened until after the expiration of the statute of limitations, the statute ordinarily is not a bar to prosecution if the indictment was timely filed. *See Ramey*, 791 F.2d at 320; *United States v. Muse*, 633 F.2d 1041, 1041 (2d Cir. 1980) (en banc), *cert. denied*, 450 U.S. 984 (1981). Other courts also have held that the filing of an indictment under seal will toll the statute of limitations if the indictment was properly sealed. *See Bracy*, 67 F.3d at 1426; *United States v. Sharpe*, 995 F.2d 49, 52 (5th Cir. 1993) (per curiam); *Srulowitz*, 819 F.2d at 40. However, the Tenth Circuit holds the minority position that the sealing of an indictment does not toll the statute of limitations. *See United States v. Thompson*, 287 F.3d 1244, 1251-52 (10th Cir. 2002) (refusing to follow the other circuits and holding that the statute of limitations is not tolled while an indictment is under seal). We follow the rule in our decision in *Burnett* and the majority of our sister circuits in finding that a timely filed and properly sealed indictment tolls the statute of limitations. We therefore must consider two factors when deciding if a sealed indictment may be opened after the statute of limitation has expired: (1) whether the indictment was properly sealed, and (2) whether the defendant has shown actual prejudice from a

sealed indictment being opened beyond the statute of limitations.[4]

We first must determine whether the indictment against Wright was properly sealed. The Government has the burden of setting forth a justification for sealing the indictment. *See Srulowitz*, 819 F.2d at 41. We have not specifically answered the question of what is a proper purpose for sealing an indictment. However, other circuits have held that any legitimate prosecutorial purpose or public interest may support the sealing of an indictment. *See United States v. DiSalvo*, 34 F.3d 1204, 1218 (3d Cir. 1994) (an indictment may be sealed for any legitimate prosecutorial purpose or in the public interest); *Sharpe*, 995 F.2d at 52 (same); *United States v. Richard*, 943 F.2d 115, 118-19 (1st Cir. 1991) (same); *United States v. Lakin*, 875 F.2d 168, 170 (8th Cir. 1989) (same); *Srulowitz*, 819 F.2d at 40 (same); *Ramey*, 791 F.2d at 321 (same). Accordingly, we look to the Government's request to seal the indictment and evaluate that request to determine whether any legitimate prosecutorial purpose or public interest supports the sealing of the indictment.

---

[4]Wright asks us to consider the three-part inquiry set forth in *United States v. Thompson*, 104 F. Supp. 2d 1303, 1306-07 (D. Kan.), *modified by*, 125 F. Supp. 2d 1297 (D. Kan. 2000), *aff'd by*, 287 F.3d 1244 (10th Cir. 2002), to determine whether a sealed indictment tolls the statute of limitations. The test instructs courts to consider: (1) was the original decision to seal the indictment proper; (2) if properly sealed, was the length of time the indictment was sealed reasonable; and (3) was the defendant prejudiced by the sealing of the indictment. We decline this invitation to adopt the test in *Thompson* because the facts of that case are distinguishable. In *Thompson*, the court found that the government had not shown that the indictment was sealed for a legitimate prosecutorial purpose. Therefore, because we find the lengthy test in *Thompson* unnecessarily cumbersome, we find that the question in this case is better answered without the use of the test articulated by the district court in *Thompson*.

The district court conducted a hearing on Wright's motion to dismiss and found that the indictment was sealed for a valid purpose and that the length of the sealing was reasonable: "The government's reasons with respect to the confidential informant as set forth today and as set forth in the government's response, in this Court's opinion, justified the 18-month delay between the date of sealing and the date of unsealing." Wright argues that because Powell's testimony was unnecessarily cumulative to the testimony of Chase and Kelsey, Powell's protection was not a legitimate reason for sealing the indictment.

We find that the district court did not abuse its discretion in holding that the indictment was properly sealed. The protection of Powell and the need to avoid compromising an ongoing investigation falls within the range of permissible reasons for sealing an indictment. *See, e.g.*, *Bracy*, 67 F.3d at 1426 (finding that the need to protect the safety of potential witnesses justified the sealing of an indictment); *DiSalvo*, 34 F.3d at 1219 (concluding that the sealing of an indictment to avoid compromising an unrelated trial was a legitimate prosecutorial purpose). The Government's investigations of the Avengers in Ohio, which involved Powell extensively, were extremely important and resulted in the indictment and conviction of nineteen individuals on various drug and racketeering charges.

As discussed, an indictment may be sealed for a multitude of reasons, including the protection of potential witnesses involved in an unrelated investigation. At the time that the indictment was sealed, the Government was conducting an investigation of the Avengers in Ohio and Michigan and Powell was an informant who was essential to the investigation. As the Government noted at the hearing on the motion to dismiss, it decided to dismiss the First Superseding Indictment in order to protect the identity of Powell while the investigation continued. The prosecutor argued that this decision "was a collective decision up to the highest level of my office, the U.S. Attorney's office here, the U.S. Attorney's

office in Cleveland, the Federal Bureau of Investigation at the highest levels in Detroit and Cleveland. . . ." The Government concedes that it thought that the investigation of the Avengers would end in 1997, but that it in fact did not end until late 1999. When the indictment was issued and sealed in 1998, the investigations were continuing and the Government wanted the identity of Powell, an important witness for the crimes allegedly committed by Wright, to remain concealed.

The argument advanced by Wright misunderstands the law relating to the sealing of an indictment. Wright asks this Court to examine Powell's testimony ex post facto and determine whether the evidence he provided justified the sealing of the indictment in the first instance. This we decline to do. It is not our task to evaluate the testimony actually provided by Powell at Wright's trial and then ascertain whether it was significant enough to justify the sealing of the indictment. We look only to the evidence presented before the magistrate judge and the district court to determine if the indictment was sealed for a legally valid purpose. Given this evidence, we find that the indictment was sealed for the legitimate prosecutorial purpose of protecting the identity of Powell, a Government informant who was involved in an unrelated investigation and provided substantial corroborating evidence in Wright's trial regarding the murder of Moore.

Furthermore, courts have held that a defendant must show "substantial, irreparable and actual prejudice" when a properly sealed indictment is unsealed beyond the statute of limitations. *Edwards*, 777 F.2d at 648; *see also United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985). This Court in *Burnett* stated, "A sealed indictment that is not opened until after the expiration of the statute of limitations will not bar prosecution unless the defendant can show actual prejudice." 1992 WL 92669, at *3 (citing *Srulowitz*, 819 F.2d at 40). The Defendant has the burden of showing that prejudice occurred. *Muse*, 633 F.2d at 1043-44. The discussion regarding actual prejudice is also relevant in

discussing Wright's Due Process claim and, accordingly, will be discussed in the following section.

### 2. Due Process

A successful Due Process claim for pre-indictment delay requires that a defendant establish: (1) prejudice to his right to a fair trial, and (2) that the delay was intentionally caused by the government in order to gain a tactical advantage. *United States v. Brown*, 667 F.2d 566, 567 (6th Cir. 1982); *see also Doggett v. United States*, 505 U.S. 647, 651-52 (1992); *United States v. Marion*, 404 U.S. 307, 324-25 (1971). The district court found that Wright failed to establish prejudice:

> Furthermore, the Court is not satisfied that the defendant suffered substantial prejudice as a result of the delay. . . . Defendant was aware as early as 1997 that the government was, quote, accusing him, unquote, with conduct relating to charges contained in the third superseding indictment. . . . To the extent that the defendant's primary alibi witness is his wife, the Court is not persuaded that her memory of relevant events has been adversely affected by the passage of time. The government alleges that, quote, her sworn [grand jury] testimony regarding his alleged alibi was preserved in April of 1997, unquote.

Wright argues that he was prejudiced by the delay between the time of his initial arrest in April 1997 and the unsealing of the indictment in January 2000 because: (1) his memory regarding his alibi and the memories of other alibi witnesses had faded; (2) the Government used the delay against him in cross-examining his alibi witnesses, Scott and Charles Ferguson, about their alleged loss of memory; (3) certain Avengers refused to testify as witnesses; (4) records, such as telephone records, were no longer available; (5) his wife had a child in the belief that he would not be prosecuted; and (6) his wife suffered emotional trauma.

Wright's first claim that he was prejudiced because of witnesses' loss of memory must fail as a matter of law. We have held that loss of memory is an insufficient reason to establish prejudice. *Payne v. Rees*, 738 F.2d 118, 121-22 (6th Cir. 1984) (citations omitted). Moreover, as the district court found, Wright can provide no evidence to support his argument that the witnesses' memories had faded. His wife, Brenda, testified both at trial and before the grand jury that she and Wright "partied" together at their home on the night of Moore's murder. It was not until trial that Brenda's memory "faded" and she testified that she was "later informed" that Scott was partying with them on the night of the murder. Scott and Ferguson, Wright's other alibi witnesses, testified in detail regarding the night of Moore's murder. Scott testified that she could not recall certain events only after she was confronted with the contradictory testimony of Powell regarding Moore's whereabouts on the day after Moore's death. Furthermore, the record does not support Wright's assertion that the Government used Scott's lack of memory to impeach her. The trial record also lacks evidence to support Wright's argument that the Government attempted to impeach Ferguson by challenging his memory. As with Scott, the Government properly questioned Ferguson to ascertain whether he was remembering the night that Moore was killed or a different night that he spent partying with Wright.

Wright's claims that witnesses refused to testify is without merit. He has presented no evidence concerning who these witnesses are or how the delay in the indictment corresponds to their inability to testify. Similarly, Wright has presented no evidence that various records became unavailable to him because of the delay. Indeed, he made no requests for any records during the trial. He only vaguely references "telephone records" in his brief on appeal, but presents nothing to support his contention that either those records were not available or that the allegedly unattainable records were relevant to his defense.

Wright's next claims of prejudice are related to the alleged effect of the delay on his family. First, Wright argues that he had a child because he believed that he would not be prosecuted. There is absolutely no case law to support the argument that the birth of a child can be used to support a claim of prejudice from a pre-indictment delay. Furthermore, his wife became pregnant before the First Superseding Indictment was dismissed in 1997 and therefore, the delay had no bearing whatsoever on Wright's family planning decisions. Next, Wright claims that the delay caused emotional strain on his wife, who testified that she was taking antidepressants and other medications at the time of trial. Again, Wright can cite to no case law that supports his argument that emotional trauma to a witness establishes prejudice. Furthermore, Wright cannot support his assertion that his wife's emotional trauma was a result of the delay, and not simply the result of the stress of the trial and a 1999 automobile accident.

Wright is unable to satisfy his "heavy burden to prove that pre-indictment delay caused actual prejudice." *United States v. Butz*, 982 F.2d 1378, 1380 (9th Cir. 1993). Because Wright is unable to establish prejudice, we need not consider the second part of the Due Process inquiry, in which a defendant must establish that delay was intentionally caused in order to gain a tactical advantage. Furthermore, Wright's statute of limitations claim also must fail because he is unable to show actual prejudice. Accordingly, the district court did not abuse its discretion in denying Wright's motion to dismiss the indictment based on violations of the statute of limitations and the Due Process Clause.

### B. Prosecutorial Misconduct

Wright argues that the improper reference to a Government exhibit and statements made by the prosecutor during closing arguments rose to the level of prosecutorial misconduct. Where a defendant makes no objection to a prosecutor's statements at trial, the standard of review is plain error.

*United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998) (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). A defendant has the burden of proving that the obvious deviation from a legal rule was so prejudicial as to affect the outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

### 1. Admission of a Government exhibit

Wright argues that the Government referenced documents from the Internal Revenue Service in its closing argument that were not admitted into evidence. However, at trial, defense counsel acknowledged to the jury that the documents marked Exhibit 56, had been admitted into evidence: "I didn't have on my exhibit list that I mark the exhibits that come in, Number 56, and so that's why I spoke out of turn. Apparently, it has been put in, and I just screwed up and missed it." In his reply brief, Wright acknowledges that "[a] closer examination of the record, after review of the Government's Brief on Appeal, indicates that the exhibit was 'slipped in' as Exhibit 56. . . ." Wright's argument concerning the exhibits clearly has been conceded and there was no prosecutorial misconduct in this instance.

### 2. The Government's closing argument

Wright also argues that the Government mischaracterized evidence and demeaned his counsel in its closing argument. First, Wright claims that the Government mischaracterized the testimony of Powell regarding a conversation between Powell and Wright. Presumably, Powell's testimony was offered to show that Wright acted suspiciously by refusing to

return to Columbus, the city where Moore was murdered, a few days after the murder. The Government stated that "[w]hen Larry Joe Powell suggested [to Wright], 'We better go down and find out what happened, that's your job,' basically. What does he (the Defendant) say? 'No, I'm not going to Columbus.'" Wright argues that this was a mischaracterization of his alleged conversation with Powell because Powell testified that the conversation took place as follows:

Q.  What was your discussion with [Wright]?
A.  I said something to the effect that maybe we should go down there. And -
Q.  Go where, to Columbus?
A.  Yeah.
Q.  For what purpose?
A.  Just for support.
. . .
A.  But [Wright] didn't want to go down there and I figured, well, he had his reasons for not wanting to go down there.
Q.  What did he say to you about why he didn't want to go down?
A.  Just no. He was firm on not wanting to go down there.

Because Wright's counsel did not object to the Government's statements, we review only for plain error. Given the testimony of Powell, the Government's statements regarding that testimony were reasonable and there was no obvious deviation from a legal rule. Accordingly, we do not find prosecutorial misconduct based on the Government's characterization of Powell's testimony.

Next, Wright argues that the Government demeaned defense counsel in his closing arguments by stating to the jury:

Mr. Amberg, I have a question for you. How can you be so far off? What you just listened to had nothing to do

with what went on in this case. Every representation he made virtually was based on the questions he asked, not from the answers that come from the stand.

Wright argues that our holding in *United States v. Carter*, 236 F.3d 777 (6th Cir. 2001), controls, and the conduct of the prosecutor in this case is similar to that in *Carter*. In *Carter*, the prosecutor misstated the testimony of a key identification witness and repeatedly insisted that defense counsel was lying about witnesses' testimony. 236 F.3d at 784-85. We stated: "When reviewing challenges to a prosecutor's remarks at trial, we examine the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error." *Id.* at 783. "[W]e conclude[d] that the prosecutor's misstatement of the evidence in this case . . . was not only error but also was plain error," and "we also conclude[d] that the prosecutor's claims that defense counsel was lying were not only error but also were plain error." *Id.* at 785. We ordered a new trial because we found that "the prosecutor's actions affected [the Defendant's] substantial rights and warrant reversal." *Id.* at 785. No such prosecutorial misconduct occurred during Wright's trial.

The defense did not object to the Government's rebuttal argument and the statements made by the Government do not rise to the level of plain error. *See United States v. August*, 984 F.2d 705, 714 (6th Cir. 1992) (per curiam) (finding that the defendant did not object and therefore waived any objection to the remarks on appeal unless the remarks constituted plain error or a defect affecting substantial rights). In closing arguments the Government criticized defense counsel for making representations based on questions posed to witnesses rather than the answers that they provided. The Government was attempting to show the jury that the statements made by defense counsel were not supported by actual testimony on the record and the Government's method of making this point was proper. Indeed, the Government objected to defense counsel's characterization of the facts

during the defense's closing statements and the district court agreed that defense counsel mischaracterized facts:

> [Prosecutor]: Oh, objection, Your Honor. This is enough of this. Counsel, 90 percent of what he's talking about is not in evidence in this case.
> THE COURT: Mr. Amberg, stay with the evidence that came in this case and the jury will be instructed to base their decision –
> . . .
> only on the evidence that came into this case and you will be instructed that lawyer's comments are not evidence.

Accordingly, we find that the statements made by the prosecutor during closing arguments do not constitute plain error and we do not find prosecutorial misconduct.

## C.  Motion to Suppress

Next, Wright argues that the district court erred in denying his motion to suppress evidence seized pursuant to a search warrant. Wright argues both that the executing agents conducted a general search that resulted in the seizure of items not listed on the warrant and that the warrant was based on a stale affidavit.

In reviewing a challenge to a motion to suppress, we review factual findings for clear error and review legal determinations *de novo*. *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000).

### *1.  General search*

Wright simply argues that he was the victim of a general warrant because several pieces of evidence were seized from his residence that were not listed with particularity on the search warrant. Though Wright does not list the "illegally" seized evidence, the Government concedes that "several

items" were seized that were not specifically listed on the warrant cover sheet. The Government argues that the items were seized because they were clearly contraband or direct evidence of the crime and subject to seizure under the "plain view" doctrine. At the suppression hearing, the district court found that agents "have a right to seize those things, number one, that are evidence of a crime that are in plain view. And secondly, in this situation, I believe had a right to seize items that related to the two crimes that were identified as the basis for the search warrant."

It is well-settled that items to be seized pursuant to a search warrant must be described with particularity to prevent "the seizure of one thing under a warrant describing another" in violation of the Fourth Amendment. *Marron v. United States*, 275 U.S. 192, 196 (1927). However, in *United States v. Brown*, 49 F.3d 1162, 1169 (6th Cir. 1995), we held that "even evidence 'not described in a search warrant may be seized if it is "reasonably related to the offense which formed the basis for the search warrant."'" (quoting *United States v. Fortenberry*, 860 F.2d 628, 636 (5th Cir. 1988) (quoting *United States v. Munroe*, 421 F.2d 644, 646 (5th Cir.), *cert. denied*, 400 U.S. 851 (1970))).

The items seized in this case were sufficiently related to the two crimes charged to fall within the scope of the search warrant. Wright does not point to any specific items in his brief on appeal; however, in his brief in support of his motion to suppress, Wright claimed that the agents executing the warrant illegally seized a leather vest in the Avenger's colors, a holster, a red address book, a brown address book, a newspaper article, documents, and a letter.

All the items seized were related to the crimes charged in the affidavit attached to the search warrant because they indicated Wright's involvement in the drug conspiracy and the murder of Moore. The vest was evidence of Wright's involvement with the Avengers motorcycle club; the holster indicated Wright's possession of a gun; the address books

contained the names and phone numbers of co-conspirators including Chase and other Avengers; the newspaper article about the murder of Moore showed that Wright had an interest in the crime; the documents linked Wright to his alias "Arthur Anderson"; and the letter from Chase described the connection of Wright and Chase to the drug conspiracy. Accordingly, the items were seized pursuant to a valid search warrant and they related directly to the two crimes charged and the information provided by the attached affidavit. *See United States v. Dale*, 991 F.2d 819, 847 (D.C. Cir. 1993) ("[T]he common-sense reading of the warrant is that the government could seize a variety of specifically identified documents and any other records that related to the [crimes described in the] affidavit."). We affirm the decision of the district court denying Wright's motion to suppress based on his allegation that agents conducted a general search.

### 2. Staleness of affidavit

Wright also argues that because the search warrant was based on information that was stale, the magistrate judge did not have probable cause to issue the warrant. Wright argues that the information contained in the affidavit used to secure the warrant was three years old and that there was no probable cause to believe that Wright's Las Vegas residence contained any items related to the crimes charged. A magistrate's finding of probable cause for the issuance of a warrant is accorded "great deference." *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000) (citations omitted). "[W]e must determine whether, in light of the totality of the circumstances, the magistrate had a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing.'" *Id.* (quoting *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 214 (1983).

Moore was murdered in 1993 and the drug conspiracy took place between 1993 and 1996. In *United States v. Henson*, we stated that "[t]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." 848 F.2d 1374, 1382 (6th Cir. 1988). Instead, we held that the question of staleness depends on the "inherent nature of the crime." *Id.* In determining whether the information provided to establish probable cause is stale, we have held that many questions must be considered including the nature of the crime and the nature of the items to be seized. *Id.* (stating that courts should not determine staleness "solely by counting the days on a calendar"). We also have stated that "a court considers the following four factors in determining whether a probable cause finding is stale: 'the defendant's course of conduct; the nature and duration of the crime; the nature of the relevant evidence; and any corroboration of the older and more recent information.'" *United States v. Helton*, 314 F.3d 812, 822 (6th Cir. 2003) (citing *United States v. Czuprynski*, 46 F.3d 560, 567 (6th Cir. 1995) (en banc)).

In reviewing the totality of the circumstances, we find that probable cause existed for the magistrate judge to issue the warrant. The affidavit provided by Agent Gary Boggs requested that agents be allowed to search Wright's residence for motel records/receipts, a medallion, a passport, and identification in the name of Arthur Anderson. The affidavit stated that Boggs and other DEA and FBI agents had been conducting an investigation of a drug distribution organization within the Avengers and that through this investigation, they had learned that Wright was involved in a cocaine distribution conspiracy and a murder for hire. The affidavit described the nature of the drug operations with which Wright was involved. The affidavit stated that Wright and Moore were members of the Avengers, were involved in the same drug conspiracy, and that the murder of Moore was a part of a dispute within the drug conspiracy. The affidavit also stated that Wright was using the alias of Arthur Anderson

at the time of the murder and that Wright was presently using the alias in Las Vegas, Nevada, where he resided at the time of the warrant. Regarding the medallion, the affidavit stated that Moore always wore a medallion with the Avengers' logo and that it had not been found at the murder scene. The affidavit stated that investigators believed that Wright may be in possession of the medallion as a "trophy" for the murder.

As the district court noted, the information regarding the medallion may have been stale because it was unlikely that Wright would have possession of such an item three years after the crime. However, the other information contained in the affidavit was sufficient to support a finding that Wright was involved in a drug conspiracy and the murder of Moore. Under the *Helton* factors, the probable cause determination was not stale because of Wright's conduct, the continuing nature of the drug conspiracy, the nature of the evidence regarding the crimes charged, and the corroboration of older and more recent information about Wright's crimes learned through the investigation of the Avengers. In light of the "great deference" we give to the magistrate judge's decision, there is nothing in the affidavit that leads us to conclude that the magistrate judge did not have a substantial basis to issue the warrant. There was extensive evidence provided in the affidavit for the magistrate judge to conclude that a search of Wright's house would lead to the seizure of evidence of wrongdoing. Accordingly, although several years passed between the alleged crimes and the issuance of the warrant, the information contained in the affidavit was relevant and timely regarding the seizure of certain evidence from Wright's residence. We therefore affirm the district court's denial of the motion to suppress.

### D. Admission of Evidence

#### 1. Hearsay statements

All evidentiary rulings, including hearsay, are reviewed for abuse of discretion. *Trepel v. Roadway Express, Inc.*, 194

F.3d 708, 716 (6th Cir. 1999). Wright argues that the district court erred in admitting a hearsay statement made by Leah Moore, the wife of Moore. The testimony was elicited to show that Wright learned the whereabouts of Moore by having his girlfriend call Leah. Leah testified that she had a conversation with Brenda, then-girlfriend of the Defendant, on the day of Moore's murder. She also testified that she heard Brenda relay the information regarding Moore's whereabouts to Wright. Defense counsel objected, but the district court overruled the objection. Leah's testimony was as follows:

A.   Brenda called me.
Q.   Brenda who?
A.   [Wright's] girlfriend.
Q.   Did you recognize her voice?
A.   Yes.
Q.   Was there anyone else in the area of the phone that you could hear?
A.   [Wright] was in the background.
Q.   What did Brenda say?
Mr. Amberg: Hearsay. Objection.
[Prosecutor]: Your Honor, I believe again, the answer is going to be a question. A question is not hearsay.

THE COURT: Go ahead.
THE WITNESS: She asked me where my husband was.

The Government argues that Leah's testimony about Brenda's question was not hearsay because "a question is by definition not hearsay."

Under the Federal Rules of Evidence, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." 801(c). While this Court has not specifically addressed the issue presented by Wright, a question is typically not hearsay because it does not assert the truth or falsity of a fact. A question merely seeks answers

and usually has no factual content. *See Quartararo v. Hanslmaier*, 186 F.3d 91, 98 (2d Cir. 1999) ("'An inquiry is not an "assertion," and accordingly is not and cannot be a hearsay statement.' *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) (quoting *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 388 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir. 1986))"); *see also United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990); *United States v. Vest*, 842 F.2d 1319, 1330 (1st Cir. 1988).

In this case, Brenda's question to Leah can be summarized as "Where is your husband?" In making that statement, Brenda is not asserting anything. She is only attempting to extract information from Leah. This inquiry from Brenda is not being used to prove the truth of the matter asserted and therefore, as the Government argues, it is not hearsay. Accordingly, the district court did not abuse its discretion in allowing the testimony to be presented.

*2. Co-conspirators statements*

Wright argues that the district court erred in admitting tape recordings that Kelsey made with Chase and Burke while Kelsey was cooperating with the Government. Wright argues that Exhibit 50(a), a recorded conversation between Kelsey and Chase on August 2, 1996, and Exhibit 52, a recorded conversation between Kelsey and Burke on September 18, 1996, were erroneously entered into evidence over the defense's objections. Wright makes three arguments regarding the recordings: (1) that Kelsey was no longer a conspirator when the recordings were made, (2) that Wright was not a member of the conspiracy, and (3) that the taped conversations were not in furtherance of the conspiracy, but rather just "idle chatter."

Federal Rule of Evidence 801(d)(2)(E) states that a statement is not hearsay if "The statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." We

review factual determinations underlying statements of co-conspirators admitted under Federal Rule of Evidence 801(d)(2)(E) for clear error. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc).

The district court admitted the recordings, stating:

> The Court is satisfied . . . that there is sufficient evidence to support a conspiracy, and the Court is satisfied that the statements as described by Mr. Allen in Exhibits 50(a) and 52, are in furtherance of the conspiracy and related to the conspiracy and related to Mr. Wright's involvement in the conspiracy, if of course, the jury believes those facts.

We have held that the Government may use the statements of co-conspirators gained from a cooperating conspirator under 801(d)(2)(E) if the Government shows by a preponderance of the evidence "(1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy and, (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *Hamilton*, 689 F.2d at 1268 (quoting *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979), *following United States v. Enright*, 579 F.2d 980 (6th Cir. 1978)).

Under Rule 801(d)(2)(E) and *Hamilton*, the statements of co-conspirators gained from a cooperating conspirator may be used by the Government. Therefore, as a matter of law, Kelsey's statements may not be excluded solely because he was cooperating with the Government at the time that the tape recordings were made.

Wright also argues that the Government has not shown that he was a member of conspiracy or that the statements on the recordings were made in furtherance of the conspiracy. *See United States v. Hamilton*, 689 F.2d 1262 (6th Cir. 1982). We disagree with Wright's argument that the Government did not show by a preponderance of the evidence that he was a

member of the conspiracy. There was extensive evidence presented that Wright, Kelsey, Chase, Ruiz, and Burke were all involved in the cocaine conspiracy. Kelsey alone testified to Wright's extensive involvement in the drug conspiracy, which included arranging storage facilities for the drugs and assisting in the stealing of airplanes to pay for shipments of cocaine. Wright was referenced in the conversations between Kelsey and Chase and Wright's role as a conspirator was shown by the Government by a preponderance of the evidence.

We also disagree with Wright's argument that the conversations were just "idle chatter." In their conversations, Kelsey and Chase discussed how Wright was demanding either money or cocaine for the theft of a plane. In the conversation between Kelsey and Burke, they discussed paying Wright for the theft of an airplane with 100 kilograms of cocaine from a transaction that they were considering. The district court found these conversations were in furtherance of the conspiracy as charged and not just "idle chatter." This finding of fact is not clearly erroneous given the evidence of the conspiracy provided in this case. *See Brown*, 169 F.3d at 348. Accordingly, we find that the district court did not abuse its discretion in admitting the taped recordings.

### E. Supplemental Arguments

Wright has submitted a *pro se* supplemental brief to this Court. In his brief, Wright argues that the Government's application of Federal Rule of Criminal Procedure 6(e)(4), the rule authorizing sealing of the indictment, violates of the statute of limitations, the Due Process Clause, and the principles of separation of powers. Wright's first two arguments are merely reiterations of the arguments raised by his attorney in his appellate brief and have already been addressed. His last argument, that the sealing of the indictment by the magistrate judge violates separation of powers, has never been presented previously to the district court or this Court.

We do not review arguments that are raised for the first time on appeal. *See Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002). This Court subscribes to the theory that "[i]n order to preserve the integrity of the appellate structure, we should not be considered a 'second shot' forum, a forum where secondary, back-up theories may be minted for the first time." *Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 396 n.3 (6th Cir. 1999) (quoting *Estate of Quirk v. Comm'r of Internal Revenue*, 928 F.2d 751, 758 (6th Cir. 1991)). Accordingly, we decline to review Wright's separation of powers argument.

Wright also submitted a *pro se* "motion for sanctions pursuant to Federal Rules of Appellate Procedure 38 and 47(b)" on January 16, 2003. He argues that the Government made "multiple errors" and "false, misleading statements" in the proof brief it submitted to this Court. On January 29, 2003, the Government submitted its final brief to this Court accompanied by a letter explaining that it had corrected the two mistakes in its citations that Wright had noted in his January 16 motion. On June 1, 2003, Wright submitted a letter to this Court that was construed as a motion to issue sanctions. In that letter, Wright argued that the Government had made some corrections to citations in its brief, but that several other factual mistakes existed and that the Government's brief is "riddled with errors." He argues that the changes made were insufficient to correct all of the errors and therefore the Government should be sanctioned.

Rule 38 is a rule to protect *appellees* from frivolous appeals. FED. R. APP. P. 38. Rule 47(b) states in relevant part: "No sanction . . . may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local circuit." FED. R. APP. P. 47(b). As a matter of law, both rules are wholly inapplicable to this case. Accordingly, Wright's motions for sanctions are meritless and we deny both motions.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the jury conviction and sentence entered by the district court.