NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0684n.06
Filed: September 8, 2006

No. 05-1763

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DENNIS GROOMS, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

Before: DAUGHTREY and COOK, Circuit Judges; and COLLIER, District Judge.[*]

COOK, Circuit Judge. A jury convicted Defendant-Appellant Dennis Grooms of conspiracy with intent to distribute heroin and attempted possession with intent to distribute heroin, and, because he had two prior felony drug convictions, the district court sentenced him to a term of life imprisonment. On appeal, Grooms challenges the admission of certain tape-recorded conversations and other statements. He also raises numerous trial- and sentencing-related arguments. For the reasons that follow, we affirm Grooms's conviction and sentence.

## I. Background

During preliminary checks of airline passengers arriving at Miami from Colombia, a customs

---

[*]The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

inspector discovered that a teenager's suitcase contained approximately four kilograms of heroin and arrested her. After determining that the girl was traveling to Detroit with Rafaela Davila, another officer arrested Davila who then agreed to cooperate with federal agents.

The next day, Davila flew with the agents to Detroit to attempt a controlled delivery of the heroin. Occupying hotel rooms, the agents had Davila call her Colombian contacts to arrange for the pick up of the drugs from her. In one call, she referred to the individual answering the call as "Gustavo." When she asked the Colombian caller when she would be able to leave Detroit, he told her she would be picked up later, but no one picked her up that day.

In the meantime, Dennis Grooms, Davila's coconspirator, was arranging her pickup. That evening Grooms called Carlos Clark and asked him if he was interested in picking someone up at the airport the next day. Clark recognized Grooms's voice, had known Grooms for fifteen years, and had dealt with him and a Colombian named "Gustobo." Grooms had told Clark that there was money to be made in heroin, and, therefore, Clark expected to be paid after the pickup.

The following morning, Clark followed up on the earlier conversation by calling Grooms to ask whether he still needed an airport pickup. Grooms called back, directing Clark to go to a particular road near the airport, and then instructed him to drive to a hotel to pick up a woman.

Also that morning, cell phone records showed Davila again called the Colombian number. Hours later, Davila finally received a call in her room from a man who explained that "we couldn't

2

do it yesterday." The caller told her that a man (who turned out to be Clark) would come for her shortly. The caller twice told Davila that the man would "take the girls out dancing" and would "check the size of the girl's pants," typical phrases relating to checking the heroin shipment.

Around noon, Clark arrived at Davila's hotel room; she asked if he had her plane ticket and money. Clark responded that Grooms would give them to her. When Clark then attempted to pick up the suitcase containing the heroin from the bed, agents entered the room and arrested him.

While Clark was in the hotel room with the agents, his cell phone rang numerous times. He told the agents that the calls (placed from two different numbers) were from Grooms. After the arrest, the agents had Clark return Grooms's calls from Clark's cell phone. In that call, Grooms demanded to know where Clark was and told him to go back home. About an hour later, Clark called Grooms, and Grooms again demanded to know Clark's location, repeating the direction to return home. Grooms later called Clark's house to see if he was there. When the agents took Clark home, they had his wife, Rhonda, leave in preparation for the expected meeting between Clark and Grooms.

Hours later, after the agents and Clark left the house, Rhonda returned home and called Grooms who did not respond to her questioning about what was going on; he hung up. Days later, Rhonda talked to Grooms; in that conversation, he told her to not mention his name, asked her to keep Clark's business going, and assured her that he would take care of her and her son. He followed up by arranging to meet Rhonda on a street corner where he gave her a brown paper bag containing

3

$8,000 cash for Clark's attorney fees.

Agents later arrested Grooms at his live-in-girlfriend's house. After his arrest, his girlfriend told government agents that she paid for the couple's monthly expenses, that Grooms was unemployed, and that he used two cell phones. At trial, she denied making these statements, and during its closing argument, the government commented on this financial arrangement.

The jury found Grooms guilty of conspiracy with intent to distribute heroin and attempted possession with intent to distribute heroin, and the court sentenced him to a term of life imprisonment. Grooms now appeals his conviction and sentence.

## II. Discussion

### A. Davila's Statements

First, Grooms challenges the government agents' testimony about Davila's post-arrest statements. Grooms, citing *Crawford v. Washington*, 541 U.S. 36 (2004), argues that Davila's alleged testimonial statements violated his Sixth Amendment right to confront the witnesses against him. Grooms contends that the agents' testimony describing Davila's statements was inadmissible hearsay.

Grooms also challenges the admission of Davila's recorded conversations because, as with the agents' testimony about Davila's statements to law enforcement, Grooms had no opportunity to

cross-examine her. Moreover, Grooms argues that the statements are not coconspirator statements because at the time Davila had these phone conversations, government agents had already arrested Davila and she was cooperating with the government. The government responds that Davila's statements were properly admitted as background evidence that merely described why law enforcement acted.

Because Grooms objected at trial to the introduction of this evidence, we review the district court's conclusions of law de novo and the factual determinations that underpin the legal conclusions for clear error. *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (quotation omitted).

Testimony offered not for the truth of the matter asserted but rather for context about a later investigation is not hearsay. *See United States v. Aguwa*, 123 F.3d 418, 421-22 (6th Cir. 1997) (finding that testimony about events leading up to a chance encounter with the defendant was not hearsay). The Sixth Circuit has "specifically sanctioned the use of such out-of-court statements to the extent that they are 'only offered to construct the sequence of events leading up to the drug transaction.'" *Id*. at 428 (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir.1989)).

Here, the record shows that both Davila's taped conversations and the government agents' testimony regarding her statements served as background evidence detailing the events leading up to the drug transaction and explaining why government agents acted as they did. The statements showed why the agents continued their investigation after Davila's arrest in Miami, set up a controlled delivery of heroin at the hotel, established surveillance of the hotel's parking lot, and

subpoenaed numerous phone records.

Moreover, these statements did not refer to Grooms or connect him to any criminal activity, which minimizes the danger of implicating Grooms through general investigatory background evidence. *See Aguwa*, 123 F.3d at 421-22 (noting danger of admitting investigatory background hearsay testimony that directly implicates defendant in criminal activity that goes to an element of the offense charged); *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990) (discussing the highly prejudicial effect of naming defendant in statements sought to be introduced for "setting the scene"); *see also United States v. Cromer*, 389 F.3d 662, 675-79 (6th Cir. 2004) (holding that out-of-court declarant statements linking defendant to nickname of individual suspected of criminal activity and matching defendant to physical description of suspect violated Sixth Amendment). Thus, "none of the . . . statements repeated at trial implicated the defendant in the drug transaction at issue," and the statements were admissible under the general investigatory hearsay exception. *Aguwa,* 123 F.3d at 421-22.

Though the district court admitted Davila's recorded statements because they were coconspirator statements, ("I think they are admissible under the exception to the hearsay rule in furtherance of the conspiracy"), the court also alluded to the evidence as nonhearsay background evidence ("All it does is I think it gives the opportunity for—to kind of complete the picture if there is a picture, and that's the only reason I'm allowing it in."). The district court's decision must be affirmed if it is correct for any reason. *United States v. Talley*, 164 F.3d 989, 999 n.4 (6th Cir. 1999)

(affirming lower court because statement gave context to conversation although district court ruled that statements were coconspirator statements).

Grooms next contends that because Davila did not appear at trial, the court's admission of her post-arrest tape-recorded conversations violated his Sixth Amendment Confrontation Clause right. *See Crawford*, 541 U.S. at 68-69 (holding that testimonial statement by wife against defendant-husband violated the Confrontation Clause). As we explained, however, both the statements contained in Davila's taped conversations and made to government agents provided only investigatory background evidence. *See Cromer*, 389 F.3d at 676-79 (holding that even if an out-of-court declarant's testimonial statements of a certain type reached the jury, they would not have violated defendant's Sixth Amendment Confrontation Clause right because "the testimony was provided merely by way of background"). These statements only "served the purpose of explaining how certain events came to pass or why the officers took [] actions" and therefore did not offend *Crawford* or the Sixth Amendment. *Id*. at 676.

B. Admission of Recorded Conversations Between Clark and Grooms

Second, Grooms argues that Clark's post-arrest recorded conversations with Grooms were not coconspirator statements because Clark agreed to cooperate with the government immediately after his arrest and was no longer part of the conspiracy. Grooms's argument fails.

Under Federal Rule of Evidence 801(d)(2)(E), "[a] statement is not hearsay if . . . [it is] a

statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The mere fact that Clark agreed to cooperate with government agents does not render the statements between Grooms and Clark inadmissible hearsay. *See United States v. Wright*, 343 F.3d 849, 866 (6th Cir. 2003) ("Therefore, as a matter of law, [a coconspirator's] statements may not be excluded solely because he was cooperating with the Government at the time that the tape recordings were made."). Instead, to decide whether the statements are admissible, a preponderance of the evidence must show: (1) a conspiracy existed; (2) the defendant against whom the statement is offered was a member of the conspiracy; and (3) that the statement was made in the course of and in furtherance of the conspiracy. *Id*.

Here, the court properly admitted the statements against Grooms because a preponderance of the evidence showed that: (1) there was a conspiracy to bring drugs into the United States; (2) phone conversations, records, and trial testimony demonstrated that Grooms was a member of the conspiracy; and (3) the Clark-Grooms recordings describing the details of the heroin pickup were made in the course of and in furtherance of the conspiracy.

### C. Plea Agreement—Polygraph Test Requirement

Next, Grooms argues that, by redacting the polygraph provision in the plea agreement, the court could have kept the entire subject from jury consideration. The court's refusal to redact, Grooms contends, affected the fairness of the trial by allowing the jury to draw impermissible credibility inferences from Clark's willingness to take a polygraph test.

In discussing the issue outside the presence of the jury, the court suggested that Grooms's counsel could easily assuage his concern by confirming, through Clark's cross-examination, that no polygraph had been administered. With that solution, the court admitted the unredacted agreement. When Grooms's counsel questioned Clark about it, however, Clark confirmed that he had not been examined by a polygrapher but went on to answer that he remained *willing* to be examined. According to Grooms, this bolstered Clark's credibility to Grooms's detriment, particularly given the importance of Clark's testimony linking Grooms to the heroin-trafficking operation. The government argues that Grooms waived the error by inviting it.

The government notes that it was Grooms's counsel who proposed admitting the Rule 11 Plea Agreement as an exhibit, and Grooms's counsel agreed to stipulate to the admissibility of the plea agreement *after* the court refused the request to redact. The "invited error" doctrine precludes Grooms from complaining now about the consequences of strategic choices. *See United States v. Macias*, 387 F.3d 509, 521 (6th Cir. 2004) (noting that taking affirmative actions typically constitute invited error and admission of such evidence cannot later be questioned by the acting party). Grooms's counsel took such affirmative steps. *United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003) (holding that defendant's attorney invited the admission of the taped extrajudicial statement by affirmatively agreeing to playing of tapes containing the alleged error). The invited error doctrine thus forecloses review by this court of the propriety of the admission of the plea agreement.

9

### D. Government's Comments about Grooms's Lifestyle

Fourth, Grooms argues that the government committed prosecutorial misconduct during its closing argument. Grooms claims that the government implied that "Grooms was guilty because of his lifestyle," and that because Grooms "freeload[ed] off" of his twenty-two year old girlfriend, "he was the type of person who would import heroin." He also argues that his lawyer's failure to object to this alleged prosecutorial misconduct meets the standard to establish ineffective assistance of trial counsel.

Because Grooms failed to object to the government's closing argument, we review for plain error. On a claim of prosecutorial misconduct, we examine: (1) whether the remarks were indeed improper; and (2) if they were improper, whether they were flagrant enough to warrant reversal of a conviction. *United States v. Jamieson*, 427 F.3d 394, 413 (6th Cir. 2005).

Grooms relies on *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000). In *Hofbauer* we reversed the defendant's conviction for sexual abuse based on the prosecutor's characterization of the defendant as a "'self-serving, illogical selfish non-compassionate, no emotional interest in a family type of person,' who acted irrational[ly] due to 'drugs and alcoholism and a general not caring about other people.'" *Id*. at 700. The prosecutor implored the jury that the crime, "'[s]ure fits him.'" *Id*. There, the bad character argument that warranted reversal permeated the prosecution's entire closing argument. *Id*.

10

The situation in this case is distinguishable. Here, the government referred in its closing argument to the fact that the forty-eight year old Grooms had registered his apartment, car, and phones in his twenty-two year old girlfriend's name to show "[t]his is a man who is good at insulating himself." The government pointed to relevant facts during closing argument and during the examination of Grooms's girlfriend, which showed Grooms avoided putting financial records in his name and that his girlfriend's $28,000 per year salary was too low to pay all the couple's bills—suggesting that Grooms obtained income from other sources. Because these facts properly furthered the government's theory of the case, we find no error, plain or otherwise, on this claim.

Grooms's ineffectiveness of counsel argument, only a single sentence in his brief, is too undeveloped for our review. *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

### E. Sufficiency of Evidence to Support Conviction/Improper Jury Instructions

Grooms also contends that the evidence failed to show that he knew either that: (1) there was heroin involved in the conspiracy, or (2) there was more than one kilogram of heroin involved to support the life sentence imposed.

When a defendant challenges the sufficiency of the evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the

11

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotations omitted). All reasonable inferences must be resolved in favor of the government. *United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001). The reviewing court must not reweigh the evidence, reevaluate the credibility of witnesses, or substitute its judgment for that of the jury. *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

To prove conspiracy to possess with intent to distribute heroin, the government must prove: (1) the existence of an agreement to violate the drug laws, (2) that each conspirator knew of the conspiracy, and (3) each conspirator intended to join and participate in the conspiracy. *Layne*, 192 F.3d at 567 (citation omitted). The government need not prove an actual agreement but rather, it must show that an individual "agreed to participate in what he knew to be a joint venture to achieve a common goal." *Id.* (quotation omitted). A "tacit or material understanding among the parties will suffice." *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997) (quotation omitted). The government can prove a conspiracy through circumstantial evidence and does not need to show that the "defendant participated in all aspects of the conspiracy." *Id.*

Grooms argues that the evidence was insufficient to show that he knew that Davila was transporting heroin. The government need not, however, prove the defendant was aware of each of his coconspirator's actions in furtherance of the conspiracy. *United States v. Schultz*, 855 F.2d 1217,

12

1221 (6th Cir. 1988). The evidence here—including testimony and phone records— showed that there was an agreement to import heroin to Detroit, that each conspirator knew about the conspiracy, and that each conspirator intended to participate in the conspiracy.

Moreover, Grooms asserts that he did not know the quantity of drugs being transported. This argument similarly fails because, as a member of the conspiracy, Grooms could be convicted for the substantive offenses his coconspirators committed during and in furtherance of the conspiracy. *United States v. Cole*, 359 F.3d 420, 432 n.18 (6th Cir. 2004) ("It is a clear tenet of American law that one can be held accountable for the acts of another conspirator." (citing *Pinkerton v. United States*, 328 U.S. 640 (1946))). The evidence demonstrates that Davila conspired with Clark and Grooms to possess approximately four kilograms of heroin with the intent to distribute it. Thus, Grooms could be convicted for the substantive offense stemming from Davila's act in furtherance of the heroin-trafficking conspiracy.

Grooms next claims the court did not properly instruct the jury on the elements of the underlying crimes. According to Grooms, the government did not prove possession because it failed to prove that he knew what the substance was that he sent Clark to pick up, that he knew Davila carried heroin, or that he knew the quantity of heroin. When a defendant neither requests a specific jury instruction nor objects to the jury instructions submitted—as is the case here—we review for plain error. *See United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000). Again, we find no error.

In both the written instructions to the jury and the court's jury charge, the court presented the elements of the charged offenses of conspiracy to possess with intent to distribute heroin (Count Two) and attempt to possess with intent to distribute heroin (Count Four), directly from the *Sixth Circuit Pattern Criminal Jury Instructions*. The court defined "with intent to distribute," "knowingly," and "willfully " using Devitt, Blackmar, Wolff and O'Malley, *Federal Jury Practice and Instructions* (4th ed. 1990). It also instructed the jury on the term "distribute" using the text of 21 U.S.C. § 802, and explained that heroin is a controlled substance under § 812. The court properly presented the jury with the elements of the two counts; Grooms fails to convince us of any error in this regard.

### F. Sentence Enhancement/Quantity of Heroin and Prior Convictions

Finally, Grooms challenges the court's enhancement of his sentence because the jury, on the general verdict, never found that Grooms was personally responsible for more than a kilogram of heroin, and the indictment did not contain his criminal history of two prior felony drug convictions. Grooms also contends that the Notice of Information used to enhance his sentence cited an inapplicable section of the criminal code.

In general, "[a] district court's construction of the sentencing guidelines is a question of law [reviewed] de novo." *United States v. Ibarra-Hernandez*, 427 F.3d 332, 334 (6th Cir. 2005). But, when a defendant does not object to a sentence—as in Grooms's case—the court reviews for plain error. *United States v. Meeker*, 411 F.3d 736, 740-41 (6th Cir. 2005).

14

Grooms argues that the district court erroneously imposed a life sentence because the jury did not make a factual finding on the quantity of drugs involved on the general verdict form. He relies on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), to argue that any factor which raises the defendant's "maximum penalty" must be submitted to a jury. Grooms claims that the government should have requested a special verdict form to have the jury determine the quantity of drugs for which Grooms was responsible.

A conspiracy conviction "does not mean that a jury need return a special verdict describing the precise amount of drugs involved in the conspiracy. It is enough that the jury supportably determines, beyond a reasonable doubt, that the conspiracy involves a drug quantity that surpasses the threshold amount." *Derman v. United States*, 298 F.3d 34, 43 n.4 (1st Cir. 2002). In the absence of a special verdict form describing the type and quantity of drugs, jury instructions may provide the necessary link "between (a) drug types and quantities and (b) the requirement that these facts be proven beyond a reasonable doubt." *United States v. Perez-Ruiz*, 353 F.3d 1, 16, 17-18 (1st Cir. 2003) (stating that "requiring a finding beyond a reasonable doubt, that the appellant had knowingly participated in a conspiracy to distribute one kilogram or more of heroin" would satisfy an *Apprendi* concern).

Here the Court's jury instructions stated, in relevant part:

> [As to Count Two,] [f]or you to find the defendant guilty of this crime, you must be convinced that the *Government has proved each and every one of the following elements beyond a reasonable doubt*.

> A) That there was an agreement between the defendant and others;
>
> B) That this agreement was to possess with intent to distribute *approximately four kilograms* of a mixture or substance containing a detectable amount of heroin;
>
> C) That heroin is a Schedule I controlled substance . . .

(emphasis added).

Later, the court instructed both orally and in writing on the issue of drug quantity:

> In Counts Two and Four of the Superceding Indictment, it is alleged that a particular amount or quantity of heroin was involved. The evidence in the case need not establish that the amount or quantity of heroin was alleged in the Superceding Indictment, but on [sic] that at least one kilogram, that is 1000 grams, of a mixture or substance containing a detectable amount of heroin was in fact the subject of the criminal activity charged in Counts Two and Four.

Thus, the jury instructions provided the necessary link for the jury to find the quantity of heroin involved in this conspiracy.

Moreover, we can analyze the indictment to "ascertain what findings can be ascribed to the jury." *Perez-Ruiz*, 353 F.3d at 15. Count Two of the indictment, the conspiracy count, describes a conspiracy "to possess with intent to distribute approximately four (4) kilograms of . . . heroin." In addition, Count Four states that Grooms "attempt[ed] to possess with intent to distribute approximately four (4) kilograms of . . . heroin," and references the applicable penalty provision which states: "[i]n the case of a violation of subsection (a) of this section involving 1 kilogram or more . . . of heroin." 21 U.S.C. § 841(b)(1)(A)(i). Thus, the court's instruction as to Count Two and the guilty verdicts on both counts of the Indictment demonstrate that the quantity of drugs involved

in this transaction exceeded the threshold amount of one kilogram.

In any event, "*Apprendi* requires that all facts that increase the penalty for a crime *beyond the statutory maximum* be submitted to a jury and proved beyond a reasonable doubt." *United States v. Brown*, 332 F.3d 363, 369 (6th Cir. 2003) (emphasis added). The court did not sentence Grooms above the statutory maximum. A violation of 21 U.S.C. § 841(b)(1)(A) carries a sentencing range of ten years to life imprisonment. The district court properly sentenced Grooms to life imprisonment—the statutory maximum sentence for the counts of conviction—because he had two prior drug felony convictions. *See United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000) ("Because the district court did not sentence either defendant to a term of more than [the statutory maximum] on the RICO counts, *Apprendi* is not triggered. . . .").

Next, according to Grooms, the fact of two prior felony drug convictions—for which the government sought an enhancement—was neither presented in the indictment nor submitted to the jury. Grooms waived this argument by stipulating to "knowingly and voluntarily giv[ing] up any right he may possess to have a jury determine whether he has a prior felony drug conviction for purposes of sentencing enhancement." Even if not waived, the fact of prior conviction need not be submitted to the jury. *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998) ("[A]n indictment must set forth each element of the crime that it charges[,] . . . [b]ut it need not set forth factors relevant only to the sentencing of an offender found guilty of the charged crime."). Thus, the prior convictions were sentencing factors and need not be submitted to the jury.

Grooms also claims error in the imposition of a sentencing enhancement through information pursuant to § 841(b)(1)(c), an inapplicable section. Because Grooms failed to object to the government's seeking a sentence enhancement through information or to the information itself, we review for plain error.

Pursuant to 21 U.S.C. § 851(a), the government filed an information to notify the court and Grooms that it would seek a sentencing enhancement based on two of his prior drug felony convictions. This statute reads:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

Grooms contends that while the government sought to enhance his sentence under 21 U.S.C. § 841(b)(1)(*A*), the information itself contained a scrivener's error referencing § 841(b)(1)(*c*), instead. But Grooms does not explain how this error affected his substantial rights: Grooms had notice that if the jury convicted him on either of the charged offenses, the government would seek an enhancement based on his prior convictions. *See Layne*, 192 F.3d at 576 ("[W]e think Defendant received reasonable notice and an opportunity to be heard on his prior convictions, and conclude that the § 851 information filed by the government was adequate."); *United States v. King*, 127 F.3d 483, 489 (6th Cir. 1997) (noting that § 851 was designed to satisfy the requirements of due process and provide the defendant with "reasonable notice and an opportunity to be heard regarding the

possibility of an enhanced sentence for recidivism").

In *King*, although the information contained an improper date of conviction for a prior conviction, the court noted that the defendant received reasonable notice. 127 F.3d at 489. The original information "set[] out the specific conviction . . . and the state court where [the defendant] was convicted." Thus, the court allowed the government to amend the information before sentencing. *Id*.

Although, here, the government never amended the typographical error, Grooms stipulated to these convictions at sentencing. *Id*. ("We recognize as well the importance of interpreting § 851's notice requirements so as to avoid elevating form over substance."). The information contained sufficient detail of the prior felony drug convictions for which the government sought an enhancement, including the counts of conviction, dates of conviction and sentencing, and the length of the prison terms. Thus, because Grooms received the notice of seeking sentence enhancement that § 851 requires, the erroneous citation in the information did not affect Grooms's substantial rights.

## III. Conclusion

We affirm the conviction and sentence.