Ronald K. CHRISTIAN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10561.

Court of Appeals of Alaska.

April 27, 2012.

480

Dan S. Bair, Assistant Public Advocate, Appeals and Statewide Defense Section, and Rachel Levitt (opening brief) and Richard Allen (reply brief), Public Advocates, Anchorage, and Ronald K. Christian, in propria persona, Tallahassee, Florida, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## *OPINION*

MANNHEIMER, Judge.

Ronald K. Christian appeals his conviction for first-degree murder, as well as the 106–year composite sentence that he received for this murder, for two accompanying acts of evidence tampering, and for various acts of theft that Christian committed by using the murder victim's debit and credit cards.

Through counsel, Christian argues (1) that his pre-sentence report should have been amended by striking the analysis of the offense offered by the State's medical examiner, Dr. Franc Fallico, and (2) that the trial judge should have allowed Christian to personally deliver the defense opening statement. The State concedes error on the first issue—the question of the pre-sentence report. With regard to the second issue, we conclude that the trial judge acted reasonably when he refused to allow Christian to deliver the opening statement.

Christian raises other issues *in propria persona.* He argues that the trial judge committed error by allowing the State to introduce evidence tending to show that

Christian and another man, Charles Greenlee, attempted to commit a robbery that was not directly related to the homicide in this case. He also argues that the trial judge violated his right of confrontation by allowing the State to introduce evidence of various out-of-court statements made by Greenlee, when Greenlee did not testify at Christian's trial. Finally, Christian argues that his sentence is excessive, to the extent that his sentences for evidence tampering and theft (a total of 7 years, 2 months' imprisonment) were imposed consecutively to his 99–year murder sentence. For the reasons explained in this opinion, we conclude that the challenged evidence was properly admitted, and that Christian's composite sentence is not clearly mistaken.

*Overview of the State's case against Christian*

On January 28, 2006, Christian met up with Christopher Lindstrom and offered to assist Lindstrom in obtaining some crack cocaine; the two men went off in search of crack cocaine in Lindstrom's truck. Christian arranged a cocaine purchase for Lindstrom, but during the course of this transaction Christian decided to kill Lindstrom. Christian also stole Lindstrom's wallet, which contained credit and debit cards.

Later, Christian met up with a friend of his, Charles Greenlee, and the two of them used Lindstrom's credit and debit cards to make numerous purchases.

Two days later, on January 30, 2006, Christian was arrested near the scene of an attempted robbery of a credit union. Greenlee was later apprehended for this same attempted robbery, after his car was connected to the crime.

Federal agents impounded Greenlee's car, and they interviewed Greenlee. During this interview, Greenlee passed a note to the agents. This note read: "I know of a murder that Ron [Christian] did[,] and I know where the vehicle is and the body."

The Anchorage police were already investigating Lindstrom's disappearance, and they considered Christian a person of interest in their investigation, so they contacted the FBI after Christian was arrested for the attempted bank robbery. Because of this contact, the federal agents informed the Anchorage police about Greenlee's note. The police obtained a warrant to search Greenlee's car. During this search, the police discovered Lindstrom's wallet and a piece of paper containing the PIN numbers for Lindstrom's bank accounts. They also found a pair of gloves that had Lindstrom's blood on the outside and someone else's DNA on the inside. (According to the testimony, Christian could not be excluded as a source of this DNA, but Lindstrom was definitely excluded as the source of the DNA.)

Greenlee subsequently took the police to Lindstrom's body, which had been shoved into the pit of an outhouse in a secluded area near Butte, and he told the police that Lindstrom's truck had been left in Girdwood.

A subsequent autopsy revealed that Lindstrom had been severely beaten, suffering multiple blows from at least two different weapons, and that Lindstrom had been shot in the head twice.

Other witnesses saw Christian in possession of Lindstrom's truck. One of them overheard Christian speaking on the phone about the need to "get rid of a gun and dump the truck". Another witness helped Christian gather approximately $2000 in cash from inside the truck. While doing this, the witness observed a puddle of blood in the truck. Christian told this witness that he had beaten someone, and that he had shot this person in the head.

In addition to the foregoing evidence, the State also had recordings of telephone calls that Christian made to Greenlee following Christian's arrest for the attempted bank robbery. In these conversations, Greenlee informed Christian that the authorities had seized his (Greenlee's) car, and that the police had a search warrant for the car. Christian perceived that this was a problem, because he had put Lindstrom's wallet in Greenlee's car. Christian apologized to Greenlee for leaving the wallet and other incriminating articles in Greenlee's car. With regard to Lindstrom's wallet, Christian at one point suggested that Greenlee could say that it belonged to a hitchhiker, and that the hitchhiker had inadvertently left it in the car. Ultimately, Christian told Greenlee to

deny any knowledge of these articles—to simply tell the police that Christian had left "a bunch of stuff" in his car. Christian assured Greenlee that he would handle it from there.

During these recorded conversations, Christian expressed confusion as to how the police could have found Lindstrom's body, and he remarked that his hands were healing—apparently, healing from the injuries he sustained while he was beating Lindstrom.

*The issue concerning the content of the pre-sentence report*

At Christian's sentencing, the State contended that Christian's offense was aggravated because he had essentially tortured Lindstrom before he finally killed him. To support this assertion of torture, the State relied in large part upon the autopsy report and the grand jury testimony of Dr. Franc Fallico, who was the State Medical Examiner at the time of the homicide.

Dr. Fallico's autopsy report stated that Lindstrom had suffered five sharp-force wounds and ten blunt-force wounds, and that it took a "significant period of time" for Lindstrom to die, given the large amount of bruising on Lindstrom's body. (Dr. Fallico explained that bruising is caused by blood leakage, and that this leakage normally will not occur absent the blood pressure generated by a beating heart.) Dr. Fallico also noted that Lindstrom had several stab wounds around his face—wounds serious enough to cause pain, but not serious enough to kill, and he concluded that it must have taken Lindstrom's assailant "a fairly long time to inflict these wounds". Dr. Fallico testified that, given the location of Lindstrom's wounds, and the mechanical force that must have been applied to Lindstrom's body, one could say that Lindstrom had been subjected to "torture".

But Dr. Fallico died before Christian was brought to trial, so his successor as medical examiner, Dr. Robert Whitmore, testified at the trial. Dr. Whitmore's testimony did not provide the same level of support for the State's assertion of torture, because Dr. Whitmore disagreed with, or at least was hesitant to endorse, several aspects of Dr. Fallico's analysis.

The pre-sentence report prepared by the Department of Corrections contained a summary of Dr. Fallico's analysis and conclusions, and the author of the report expressly cited Dr. Fallico's findings as the author's basis for asserting that Christian tortured Lindstrom.

Christian's attorney objected to this portion of the pre-sentence report. The defense attorney pointed out that Christian had never had the opportunity to cross-examine Dr. Fallico, and that Dr. Whitmore's analysis and conclusions differed from Dr. Fallico's on several key points. The defense attorney argued that, because Dr. Whitmore's testimony was the product of an adversarial process, it should supersede the pre-sentence report's hearsay account of Dr. Fallico's analysis and conclusions—and, therefore, Dr. Fallico's analysis and conclusions should be deleted from the pre-sentence report to the extent that they were inconsistent with Dr. Whitmore's testimony.

The sentencing judge—Superior Court Judge Philip R. Volland—acknowledged the disparities between Dr. Fallico's conclusions and Dr. Whitmore's conclusions, and he further acknowledged that Dr. Fallico's conclusions had never been tested by cross-examination. However, Judge Volland declined to remove the descriptions of Dr. Fallico's conclusions from the pre-sentence report. Instead, the judge declared that he would give more weight to Dr. Whitmore's testimony.

On appeal, Christian argues that Alaska Criminal Rule 32.1(f)(5) required Judge Volland to delete the contested portions of the pre-sentence report—because Christian relied on Dr. Whitmore's testimony to challenge those portions of the pre-sentence report, because the State offered no witnesses to contradict Dr. Whitmore's testimony, and because the State essentially conceded that Dr. Whitmore's testimony was more accurate. *See Cragg v. State*, 957 P.2d 1365, 1367–68 (Alaska App.1998).

On appeal, the State acknowledges that, under Criminal Rule 32.1(f)(5) as construed in *Cragg*, Judge Volland had a duty to delete unproved factual allegations from the pre-sentence report, even if the judge was personally ready to disregard those allegations

when he sentenced Christian. The State further concedes that Dr. Fallico's conclusions, as recited in the pre-sentence report, are inaccurate. We therefore direct the superior court to correct the pre-sentence report.

*Judge Volland's refusal to let Christian personally deliver the defense opening statement*

During jury selection, Christian's attorney notified Judge Volland that Christian wished to function as co-counsel during the trial—and that, in particular, he wished to personally deliver the defense opening statement, and he wished to personally cross-examine four of the State's witnesses. The defense attorney told Judge Volland that Christian had already written out the opening statement that he intended to give, and the defense attorney indicated that she had screened Christian's statement to make sure that it posed no problems.

In response to a question from Judge Volland, the defense attorney acknowledged that Christian had already decided that he would *not* take the stand at trial, thus raising the possibility that Christian would use the opening statement as a means of personally communicating his view of the case to the jury without submitting to cross-examination. But the defense attorney told Judge Volland that she had checked Christian's proposed opening statement, and she assured the judge that "none of the statements [Christian intended to make] would be testimonial in nature". The defense attorney offered to have Judge Volland examine Christian's proposed opening statement if the judge had any questions or reservations.

Judge Volland personally questioned Christian about his educational background and training, and he warned Christian that he might be taking a risk by not entrusting the entire defense effort to his attorney. The judge also explained that he was having his law clerk research the question of having a defendant assume co-counsel status at trial, and he intended to make a decision on Christian's request as soon as he could.

The next day, shortly before the parties presented their opening statements to the jury, Judge Volland announced his decision regarding Christian's request to function as co-counsel.

Judge Volland told the parties that he had read a number of this Court's decisions in this area, and that those cases made it clear that a defendant has no constitutional right to assume co-counsel status and receive "hybrid" representation. This is correct. As we explained in *Ortberg v. State*, 751 P.2d 1368, 1375 (Alaska App.1988):

> Although the right to counsel and the right to self-representation are constitutionally protected, the right to participate as co-counsel or have hybrid representation is not. The trial court has broad discretion to deny hybrid representation or co-counsel status. *Annas [v. State ]*, 726 P.2d [552,] 557 [ (Alaska App.1986) ]; *Cano v. Anchorage*, 627 P.2d 660, 664 (Alaska App. 1981).

Judge Volland also noted that in *Garrison v. State*, 762 P.2d 465 (Alaska App.1988), this Court drew a distinction between *pro se* defendants seeking the guidance or input of stand-by counsel, and (on the other hand) defendants like Christian, who are represented by counsel and who seek to act as a substitute for their attorney during portions of the case. In *Garrison*, we held that defendants in this latter situation have a significantly lesser need for hybrid representation—and that this is a factor that a trial judge can properly consider when ruling on the defendant's request. *Garrison*, 762 P.2d at 467. *Garrison* also acknowledged that a defendant's co-participation in the trial process was potentially disruptive to the proceedings. *Ibid.*

Nevertheless, echoing what this Court said in *Cano v. Anchorage*, 627 P.2d at 664 ("[T]he accused has a substantial and legitimate interest in the manner in which [the] trial is conducted ... an interest which ought not to be taken lightly."), Judge Volland acknowledged that Christian had "a significant interest in how the management of his trial proceeds", and that he (Judge Volland) was required "to give due consideration to Mr. Christian's request".

The judge found that Christian had more education, intelligence, and training than most criminal defendants; he noted that Christian was currently enrolled in a paralegal training program. The judge also found

that Christian fully understood the risks of conducting part of the defense himself. In addition, Judge Volland found that Christian would probably be able to conduct himself within the bounds of courtroom decorum, and that Christian had a good working relationship with his attorney.

(*See Ortberg,* 751 P.2d at 1375: "[C]o-counsel [status] or hybrid representation should only be allowed if counsel and the defendant can work together and present a coherent defense.")

Nevertheless, Judge Volland was worried that, because of the lateness of Christian's request, he might not be able to fully research and consider the ramifications of letting Christian participate as co-counsel. (Christian did not inform the judge of the details of his request for co-counsel participation until the day before the parties' opening statements.) Judge Volland noted that in *Garrison,* this Court discussed the tardiness of a defendant's request for co-counsel status as a factor that a trial judge could properly consider in denying the request. *Garrison,* 762 P.2d at 467 n. 1.

Additionally, Judge Volland noted that allowing Christian to personally deliver the defense opening statement potentially raised significantly greater problems than allowing Christian to cross-examine some of the State's witnesses. Christian and his attorney had already announced that Christian did not intend to take the stand at trial. Thus, if Christian were allowed to deliver the opening statement, this would potentially permit him to make statements about the case, free from cross-examination.

(See *Garrison,* 762 P.2d at 466, and *Lonis v. State,* 998 P.2d 441, 446–47 (Alaska App. 2000), where we noted the potential for unfairness if a defendant were allowed to personally address the jury concerning the merits of the case without being subject to cross-examination.)

After considering these various aspects of the situation, Judge Volland granted part of Christian's motion. He allowed Christian to cross-examine a few of the State's witnesses (the ones that the defense attorney had earlier identified), but he denied Christian's request to personally deliver the opening state-

ment. Here is Judge Volland's explanation of that latter ruling:

*The Court:* It is hard ... for me to imagine how [Mr. Christian's] giving an opening statement is not, in essence, a personal statement [to the jury]. I don't know what the defense in this case is going to be. But [whether] it's [that] the State can't prove a certain mental intent, or it's a specific enumerated defense—no matter how the statement is phrased, it comes across nonetheless as Mr. Christian's personal statement and belief about his innocence. I mean, that's what the [defense] opening statement ought to be: an assertion [as to] why there ought not to be a guilty verdict rendered. And in my mind, that allows [Mr. Christian] to [personally] assert his innocence, albeit indirectly, and not be cross-examined.

On appeal, Christian notes that his attorney offered to provide Judge Volland with a written draft of the defense opening statement, so that the judge could see for himself whether it contained any assertions that might be viewed as testimonial, but Judge Volland declined this offer. Christian now argues that Judge Volland abused his discretion when he issued his ruling on this point without examining the draft opening statement.

Christian did not preserve his draft opening statement as part of the record in this case. We therefore do not know precisely what Christian intended to say, or why his attorney believed that none of the statements Christian intended to make to the jury were "testimonial".

■ Since we do not know the precise text of the draft opening statement that Christian's attorney offered to Judge Volland, we must presume that this draft statement embraced basically the same assertions as the opening statement that Christian's attorney delivered to the jury a short time after Judge Volland made his ruling. And the content of the defense attorney's opening statement confirms Judge Volland's conclusion that it would have been unfair to have Christian deliver this statement personally.

In the defense attorney's opening statement, she conceded that Christian used Lindstrom's stolen credit and debit cards, and that he was therefore guilty of the multiple counts of theft charged in the indictment. The defense attorney also conceded that Christian was guilty of the two counts of evidence tampering, because he dumped Lindstrom's body into the pit of an outhouse, and because he hid Lindstrom's vehicle in Girdwood.

With regard to the homicide, the defense attorney conceded that, prior to Lindstrom's death, Christian beat Lindstrom and cut him with a knife. Based on this conduct, the defense attorney suggested that Christian should be found guilty of manslaughter. But the defense attorney declared that Christian should not be convicted of murder—because there was a strong possibility that Charles Greenlee was the person who shot Lindstrom:

> *Defense Attorney:* We're going to ask you to take a very critical look at the State's evidence ... as it relates to who actually shot Mr. Lindstrom, and whether or not the State's evidence establishe[s] that it was Ron Christian who shot Mr. Lindstrom. Because what you're going to hear, from the witnesses who come and testify here in this case, is that another individual was present at the scene of Mr. Lindstrom's death.... That guy's name is Charles Greenlee....
>
> Charles Greenlee is Mr. Christian's partner in crime, and I don't mean that in just a ... euphemistic way. He's actually Mr. Christian's partner in crime. You're going to hear that he ... is accused of robbing a bank with Mr. Christian. In fact, that's how this whole case [came] under investigation by [the Anchorage police].
>
> You're going to hear from the State's witnesses, and ... cell phone records [will also] establish, that Mr. Greenlee was there at the scene of the murder, and that Mr. Greenlee also had the victim's wallet after he died. And that Mr. Greenlee also was benefiting from using the credit cards and the ATM cards from Mr. Christian [*sic:* Mr. Lindstrom].
>
> Ladies and gentlemen, we will ask you to hold Mr. Christian accountable for those acts that the evidence actually estab-

lishe[s]. And all we ask from you in this case is that you take a very critical look at whether or not the State's evidence, one, establishes that Mr. Christian had the gun, and [two,] whether or not it establishes who actually shot Mr. Lindstrom.

Essentially every occurrence mentioned in the defense attorney's opening statement was one that Christian personally participated in. Had Christian delivered this opening statement, he inevitably would have personally vouched for the truth of most of these assertions of fact—in particular, the many concessions of his guilt. This being so, the jury could reasonably have concluded that Christian was at least implicitly vouching for the truth of the remaining assertions of fact—especially, the assertions as to Greenlee's participation in these crimes, and why it was reasonable to believe that Greenlee, not Christian, was the one who shot Lindstrom.

In other words, given Christian's decision not to take the stand at his trial, if Christian had personally delivered this opening statement, he essentially would have personally asserted his innocence without subjecting himself to cross-examination.

■ For these reasons, we conclude that even if Judge Volland should have accepted the defense attorney's offer to review the draft opening statement, any error was harmless. The content of the defense opening statement (as it was delivered) fully supports Judge Volland's conclusion that it would be unfair to allow Christian to deliver the opening statement himself, because this would give Christian the opportunity to personally endorse a particular view of the facts without subjecting himself to cross-examination.

Accordingly, Judge Volland did not abuse his discretion when he denied this portion of Christian's request to participate as co-counsel at the trial.

*The evidence tending to prove that Christian was involved in the attempted bank robbery*

At trial, Christian's attorney asked Judge Volland to prohibit the State from introduc-

ing evidence that Christian was involved in the attempted robbery of the credit union.

The defense attorney conceded that the FBI's questioning of Charles Greenlee concerning this attempted robbery "was the event that got the ball rolling"—because, during that interview, Greenlee passed a note to the federal agents in which Greenlee offered to provide information regarding the homicide. But the defense attorney argued that, once Greenlee gave the note to the federal agents, the homicide investigation "took on a life of its own".

According to the defense attorney, the homicide investigation was completely separate from the robbery investigation. The defense attorney acknowledged that the jury could properly be informed that *Greenlee* was a suspect in another criminal investigation—because this explained the origin of Greenlee's note. But the defense attorney argued, once the police were in possession of Greenlee's note, the homicide investigation that followed had no relation to the attempted bank robbery—and, thus, there was no need to explain that Christian was a suspect in the attempted robbery.

Judge Volland ruled that the evidence was admissible because it helped to explain the relationship between Christian and Greenlee, and their joint connection to the homicide and its aftermath (the tampering with evidence, and the various thefts committed with Lindstrom's credit and debit cards). Judge Volland also noted that this evidence might explain Greenlee's motive for offering to assist the authorities in the homicide investigation.

(Christian had already been arrested for the attempted robbery when the FBI interviewed Greenlee. As Judge Volland explained, Greenlee "[might have wanted] to implicate Mr. Christian in the homicide [because Greenlee knew] that Mr. Christian [could] implicate [Greenlee] in the bank robbery—because they were joint participants in it.")

On appeal, Christian renews his argument that his involvement in the attempted bank robbery was irrelevant to the homicide, and that this evidence was unfairly prejudicial. The State responds that this evidence was needed "to understand and evaluate the [homicide] investigation".

The fact that particular information may help to explain the origin or the progress of the police investigation in a criminal case does not necessarily mean that this information should be admitted at trial. The ultimate question being litigated at a criminal trial is the defendant's guilt or innocence of the crime charged—not the reasonableness or competence of the police investigation.

Thus, for instance, the police may have seen the defendant committing a burglary because the defendant was a suspect in another serious crime and (for this reason) the police were keeping the defendant under surveillance. If the other crime has no particular relationship to the burglary, then the fact that the defendant was suspected of that other crime would normally be inadmissible.

True, the fact that the defendant was suspected of the other crime would explain why the police were keeping the defendant under surveillance. But in this hypothetical situation, unless the defendant asserted that the police never observed him committing the burglary, the reason for the police surveillance would have little or no relevance to the issues being litigated at the defendant's burglary trial—and, thus, any information linking the defendant to an unrelated serious crime would be unfairly prejudicial.

In Christian's case, however, the evidence linking him to the attempted bank robbery *was* relevant to the jury's assessment of Christian's guilt or innocence of the charges being litigated.

The fact that Christian and Greenlee jointly participated in the attempted bank robbery helped to explain the relationship between the two men—and, in particular, helped to explain why Christian might be willing to trust Greenlee by saying things to Greenlee, and by doing things in his presence, that incriminated Christian in the homicide and the ensuing crimes. Additionally, the fact that Christian and Greenlee jointly participated in the attempted robbery, and that Greenlee's car was used in that robbery attempt, helped to explain how Lindstrom's wallet ended up in Greenlee's car. More-

over, as Judge Volland noted, the fact that Christian and Greenlee jointly participated in the attempted robbery provided a possible explanation of Greenlee's motive for offering to assist the authorities in the homicide investigation.

We also note, with regard to the potential unfair prejudice of this evidence, that several witnesses at Christian's trial testified (without objection) that Christian talked about, even bragged about, *other* robberies he had committed. It is therefore unlikely that the information about this particular attempted robbery would have affected the jury's decision in an improper way.

For all of these reasons, we conclude that Judge Volland did not abuse his discretion when he allowed the State to introduce this evidence at Christian's trial.

### The evidence of Christian's telephone calls to Greenlee from jail

On appeal, Christian argues that his right of confrontation was violated when the State introduced the content of Christian's telephone calls to Greenlee from jail. Christian points out that Greenlee did not testify at trial, and thus Christian never had an opportunity to confront Greenlee about the statements he made during these conversations.

But Greenlee's statements during these phone calls were not introduced for a hearsay purpose; that is, these statements were not introduced for the truth of the matters asserted by Greenlee. Rather, Greenlee's side of those conversations was offered for the non-hearsay purpose of providing the context for understanding *Christian's* statements during those conversations.[1]

Because the evidence of Greenlee's out-of-court statements was offered for a non-hearsay purpose, the introduction of that evidence did not implicate Christian's right of confrontation under the Sixth Amendment. As the United States Supreme Court explained in *Crawford v. Washington*, the Sixth Amendment's confrontation clause bars evidence if it is both "testimonial" and "hearsay", but it does not bar evidence if that evidence is not hearsay: "The [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[2]

As this Court recently noted in *Estes v. State*, 249 P.3d 313, 316 (Alaska App.2011), in the years since the United States Supreme Court issued *Crawford*, the federal circuit courts of appeal have repeatedly held that when out-of-court statements are introduced, not for proof of the matters asserted, but for the purpose of providing the context necessary for understanding admissible evidence, the admission of those out-of-court statements does not violate the confrontation clause.[3]

For these reasons, we reject Christian's challenge to this evidence.

### The note that Greenlee gave to the FBI

As we have explained, during Greenlee's interview with the FBI, he passed a note to the agents in which he declared that he knew about a homicide that Christian had committed, and that he knew the locations of the victim's body and the victim's vehicle. At Christian's trial, this note was offered into evidence as a State's exhibit. Christian's attorney did not object. But now, on appeal,

---

1. See *Estes v. State*, 249 P.3d 313, 315–16 (Alaska App.2011); *Lipscomb v. State*, 700 P.2d 1298, 1304–05 (Alaska App.1985); *Linne v. State*, 674 P.2d 1345, 1356 n. 8 (Alaska App.1983).

2. 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 1369 n. 9, 158 L.Ed.2d 177 (2004).

3. See *United States v. Walter*, 434 F.3d 30, 35 (1st Cir.2006) ("*Crawford* ... does not call into question this Court's precedents holding that statements introduced solely to place a defendant's admissions into context are not hearsay, and as such, do not run afoul of the Confrontation Clause."); *United States v. Domínguez*, 280 Fed.

Appx. 81, 84 (2nd Cir.2008); *United States v. Fleming*, 287 Fed.Appx. 150, 153–54 (3rd Cir. 2008); *United States v. Barraza*, 365 Fed.Appx. 526, 530 (4th Cir.2010); *United States v. Ríos*, 298 Fed.Appx. 312, 314 (5th Cir.2008); *United States v. Grooms*, 194 Fed.Appx. 355, 358–360 (6th Cir.2006); *United States v. Bernea–Boone*, 563 F.3d 621, 626 (7th Cir.2009); *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir.2010); *United States v. Moore*, 365 Fed.Appx. 800, 802 (9th Cir.2010); *United States v. Lopez–Medina*, 596 F.3d 716, 734–36 (10th Cir.2010); *United States v. Valdes–Fiallo*, 213 Fed.Appx. 957, 961 (11th Cir.2007).

Christian argues that this note was inadmissible hearsay, and that the admission of this note violated his right of confrontation.

Hearsay evidence is admissible if there is no objection.[4] Thus, even if the note was offered for a hearsay purpose, it is too late for Christian to object to the evidence on hearsay grounds.

This leaves Christian's confrontation clause argument. Because Christian did not raise a confrontation clause objection in the superior court, he must now show that the admission of the note amounted to plain error.

It is true that Greenlee's note contains the assertion that Christian committed a murder, and (given the circumstances) this assertion was undoubtedly "testimonial" for confrontation clause purposes. But the record indicates that the State's primary purpose for introducing the note was to explain how Christian became the subject of the homicide investigation. In other words, the State did not rely on the note as substantive proof of Christian's guilt, but instead offered it for a non-hearsay purpose. And as we have explained, out-of-court statements that are offered for a non-hearsay purpose do not violate the confrontation clause.

Moreover, there was plenty of witness testimony (testimony to which there was no objection) describing the content of the note, and describing how the note came into the possession of the authorities. The introduction of the physical note itself added little or nothing to this testimony.

In addition, there was a plausible tactical reason for the defense attorney to withhold objection to the note (and the testimony describing it). In summation to the jury, the defense attorney argued that Greenlee was much more involved in the homicide than he was willing to admit, and that Greenlee pointed the finger at Christian so that he might deflect suspicion from himself. Greenlee's decision to write the note to the FBI while he was being interrogated provided support for the defense attorney's theory. Thus, there was a plausible reason why the defense attorney would choose not to object to the admission of the note.

For all of these reasons, the admission of the physical note as an exhibit at Christian's trial did not constitute plain error.

### The photograph of Greenlee

Christian also argues that his right of confrontation was violated by the fact that a photograph of Greenlee was exhibited to the jurors during the trial. However, Christian offers no explanation of how this photograph constituted testimonial hearsay. We therefore reject this confrontation clause argument as inadequately briefed.

### Whether Christian's composite sentence is excessive

As we explained toward the beginning of this opinion, Christian received a sentence of 99 years' imprisonment for the crime of first-degree murder, and he received a total of 7 years, 2 months' consecutive imprisonment for his other crimes of evidence tampering and theft. Thus, Christian's composite term of imprisonment is 106 years, 2 months.

Christian does not challenge his 99–year sentence for murder, but he argues that Judge Volland was clearly mistaken when he imposed the consecutive 7 years, 2 months.

Under Alaska law, a sentencing judge should not impose a composite term of imprisonment that exceeds the maximum term of imprisonment for the defendant's most serious offense unless the judge finds that the longer sentence is necessary to protect the public, or that the longer sentence is necessary to satisfy one or more of the other sentencing goals codified in AS 12.55.005. *Phelps v. State*, 236 P.3d 381, 393–94 (Alaska App.2010), construing *Neal v. State*, 628 P.2d 19, 21 (Alaska 1981).

In sentencing Christian, Judge Volland noted that Christian's criminal history stretched back to 1980, and that Christian was on felony probation at the time of the events in this case. The judge found that

---

**4.** *Rusenstrom v. Rusenstrom*, 981 P.2d 558, 560–61 (Alaska 1999); *Bird v. Starkey*, 914 P.2d 1246, 1248 n. 1 (Alaska 1996); *Savely v. State*, 180 P.3d 961, 962 (Alaska App.2008); *Douglas v. State*, 166 P.3d 61, 85 (Alaska App.2007); *Cassell v. State*, 645 P.2d 219, 220–21 (Alaska App.1982).

Christian's conduct in the present case demonstrated "a degree of brutality not often seen in homicides". And even though Judge Volland rejected the State's contention that Christian subjected Lindstrom to substantial torture, the judge found that Christian's actions demonstrated deliberate cruelty and a "callousness and depravity that ... shocks the ... conscience".

Based on Christian's conduct and his criminal history, Judge Volland concluded that Christian's previous probation and parole supervision had done nothing to deter Christian from engaging in further criminal conduct, and that similar measures were unlikely to deter Christian in the future. The judge declared that Christian's likelihood of rehabilitation was "virtually nil".

Although Judge Volland never expressly referred to the *Neal* decision, and although the judge never expressly stated that Christian's composite term of 106 years, 2 months was necessary to protect the public, one can readily infer from Judge Volland's sentencing remarks that he reached this conclusion. As the *Neal* decision recognizes, an appellate court may infer an appropriate *Neal* finding from the sentencing record if that record clearly establishes the sentencing judge's reasons for imposing the sentence. *Neal*, 628 P.2d at 21; *see also Wheeler v. State*, 863 P.2d 858, 860 (Alaska App.1993); *O'Brannon v. State*, 812 P.2d 222, 232 (Alaska App.1991).

For these reasons, we conclude that the *Neal* rule was satisfied, and that Christian's composite term of imprisonment is not clearly mistaken. Accordingly, we affirm Christian's sentence.

*Conclusion*

With the exception that the superior court must amend the pre-sentence report, the judgement of the superior court is AFFIRMED.